**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
**LEEWARD CONSTRUCTION, INC.,**          :

         **Plaintiff,**          :          **REPORT & RECOMMENDATION**

         **- against -**          :          **05 Civ. 8384 (CS)(LMS)**

**SULLIVAN WEST CENTRAL SCHOOL** :
**DISTRICT,**
                                       :
         **Defendant.**
-------------------------------------------------------x
**SULLIVAN WEST CENTRAL SCHOOL**
**DISTRICT**          :
         **Third-Party Plaintiff,**
                                       :
         **- against-**
                                       :
**TURNER CONSTRUCTION COMPANY**
**and THE HILLIER GROUP**          :
**ARCHITECTURE, NEW YORK, P.C.,**
                                       :
         **Third-Party Defendants.**
-------------------------------------------------------x

**TO: THE HONORABLE CATHY SEIBEL, U.S.D.J.**

      This lawsuit was originally brought by Leeward Construction, Inc. ("Leeward") against

Sullivan West Central School District (the "District") asserting claims for breach of contract and

quantum meruit based on allegations that the District delayed, obstructed, and interfered with site

construction work that Leeward was contracted to perform in connection with the construction of

a new high school.  See Docket # 1 (Complaint).  In turn, the District commenced a third-party

action against Turner Construction Company ("Turner"), which acted as construction manager

for the high school construction project, and The Hillier Group Architecture, New York, P.C.

("Hillier"), which acted as the architect for the high school construction project.  In its Third-

Party Complaint, the District asserts a derivative claim against both Turner and Hillier, a breach of contract claim against Hillier, a claim for architectural malpractice against Hillier, and a breach of contract claim against Turner.  See Docket # 21 (Third-Party Complaint).  Hillier filed an Answer to the Third-Party Complaint which asserted both cross-claims against Turner and counterclaims against the District seeking unpaid fees.  See Docket # 25 (Answer to Third-Party Complaint with Counterclaims).

Leeward and the District have settled the original action, see Docket # 43 (Stipulation and Order of Dismissal), and the District has settled its claims against Turner.  See Docket # 92 (Stipulation of Partial Dismissal).  In addition, an order has been entered barring Hillier from asserting cross-claims against Turner.  See Docket # 91 (Bar Order With Respect to Claims Against Third-Party Defendant Turner Construction Company).  Accordingly, the only claims outstanding in this litigation are the District's claims against Hillier and Hillier's counterclaims against the District.

Currently before the Court are the District's motion for partial summary judgment on its claims and Hillier's counterclaims, Docket # 58,[1] and Hillier's motion for partial summary judgment seeking dismissal of one of the District's claims as well as a limit on the amount of damages recoverable by the District.  Docket # 50.  For the reasons that follow, I conclude, and respectfully recommend that Your Honor should conclude, that both the District's motion and Hillier's motion should be granted in part and denied in part.

---

[1]The District's motion was filed before it settled with Turner.  The Court therefore disregards that portion of the District's motion papers directed at Turner.

**BACKGROUND**

This case has a lengthy history, as evidenced by the voluminous submissions of the parties.  The following is thus a recitation of those facts that are most relevant to the Court's decision of the outstanding motions.

This litigation stems from disputes surrounding a construction project occasioned by the merger of the Delaware Valley, Jeffersonville/Youngsville, and Narrowsburg school districts into the Sullivan West Central School District in Sullivan County, New York.  In connection with the merger, the District sought both to upgrade and to renovate existing educational facilities as well as to build a new high school.  District's Local Rule 56.1 Statement ("District's 56.1") [Docket # 66] ¶ 1.[2]  The District entered into a contract with Turner to act as Construction Manager for the project.  Id. ¶¶ 2-3.  The District entered into a contract with Hillier to serve as the Architect for the project.  Id. ¶¶ 5-6.  Among the services Hillier contracted to provide were structural, mechanical, civil, and electrical engineering services.  District Ex. 6 ¶ 2.1.1.[3]  Hillier delegated responsibility for the civil engineering work on the project to its subsidiary, Hillier Engineering Technologies, Inc. ("HET").  District's 56.1 ¶¶ 43-44; Hillier's Counter Statement to District's Local Rule 56.1 Statement ("Hillier's 56.1 Counter-statement") [Docket # 68] ¶¶ 43-44.

Bids for the construction project were opened on or about April 11, 2001.  District's 56.1

_____

[2]The Court assumes that any paragraphs in the District's Local Rule 56.1 Statement that are not addressed by Hillier in its Local Rule 56.1 Counter-statement are undisputed.  See Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

[3]The District's Exhibits in support of its motion are Docket #'s 61-62.

¶ 70.  Bids were received on May 24, 2001, for the site work, and on May 31, 2001 for the remainder of the work related to the project.  District's 56.1 ¶ 77; District Ex. 14.  The bid total was $33,286,174, exceeding Turner's original estimated construction budget of $24,810,839.  District's 56.1 ¶ 78; District Ex. 14.  This also exceeded the approved program cost for construction of the new high school, which was $21,427,189.  District's 56.1 ¶ 79.  Turner and Hillier blamed each other for this bid bust.  Id. ¶ 80.  Turner recommended that the District re-bid the project and, in consultation with Hillier, provided the District with four different options for modifying the project so that it could come within the voter-approved budget.  District Ex. 14.  The bid bust resulted in a one-year delay of the high school construction project.  District Ex. 16 at 48-49.

At the time of the bid bust, and in contrast to the bids received for construction of the high school building itself, the District received a bid for the site work at the high school that came in below the budgeted amount.  District's 56.1 ¶ 100; District Ex. 14.  Consequently, the District awarded that contract to Leeward, the low bidder.  Id.; Hillier Ex. 56.[4]

Over a year earlier, on April 5, 2000, a Draft Environmental Impact Statement ("DEIS") was issued which indicated the possible existence of federally-regulated wetlands on the high school construction site.  District Ex. 21.  In the spring of 2001, a consultant was hired by Turner to delineate the wetlands on the site.  District's 56.1 ¶ 123.  The delineation report, issued on April 25, 2001, indicated the existence of federally-regulated wetlands in areas where work was to be performed by the site contractor.  Id. ¶ 124; District Exs. 20, 24.  However, it was not until

---

[4]Hillier's Exhibits in support of its motion and in opposition to the District's motion are Docket #'s 93-94.

after Leeward had been awarded the contract for the site work that Hillier, in June or July of 2001, revised the site plans to indicate the existence of wetlands. District's 56.1 ¶ 131. Redesign of the site plan to take into account the existence of wetlands was a significant change to the site work bid package as it involved a significant amount of money and potentially a significant delay. Id. ¶ 133.

Meanwhile, on May 7, 2001, the wetlands consultant contacted the U.S. Army Corps of Engineers to request a jurisdictional determination as to whether the Army Corps of Engineers agreed with the consultant's proposed delineation of wetlands. See Hillier Ex. 47. In connection with that request, the Army Corps of Engineers conducted a site visit on June 20, 2001. District Ex. 20. At that time, the District was told that it would take the Army Corps of Engineers 45 days to approve the permit needed by the District to perform the wetlands mitigation work. Id. However, the Army Corps of Engineers did not issue a wetlands permit to the District until March 6, 2002, and the District was not allowed to perform any work under the permit until it had received approval from the New York State Department of Environmental Conservation ("NYSDEC"). See Hillier Ex. 48. The NYSDEC issued its approval to the District on July 3, 2002. See Hillier Ex. 49. The wetlands mitigation work ended up costing the District $147,322.00. District's 56.1 ¶ 136.

Issues also arose with respect to the erosion and sediment ("E&S") controls and stormwater management system designed for the high school construction site. The District and Hillier dispute whether HET incorporated specific E&S and stormwater management design guidelines into the design. District's 56.1 ¶ 159; Hillier's 56.1 Counter-statement ¶ 159. They also dispute whether the construction drawings and specifications limit the amount of disturbance

5

for the site contractor and whether the site contractor could clear up to 40 acres at any one time. District's 56.1 ¶¶ 160-61; Hillier Ex. 33 at 141-42; Hillier's 56.1 Counter-statement ¶¶ 160-61.

In a letter dated April 5, 2001, the Sullivan County Soil and Water Conservation District informed HET that with respect to its stormwater detention basins, it should be sure to do its hydrologic computations using a Type II storm condition.  District Ex. 35.  However, in the summer of 2001, Hillier found out that HET's stormwater management design was calculated using the wrong storm condition type.  District's 56.1 ¶ 172.  In a letter dated July 11, 2001, Leeward informed Turner that it was concerned that the E&S controls that had been designed were inadequate because of the type of soils on the site.  Id. ¶ 169.  HET responded with a design change intended to address this inadequacy.  District Ex. 37.  In October, 2001, Leeward sought further guidance from the engineer as to how to address problems with E&S controls.  District Ex. 38.  On or about November 1, 2001, turbid water discharged from the high school construction site, causing damage to a neighboring property owner's pond.  District Ex. 39.  On April 4, 2002, the NYSDEC issued a citation to Turner for a violation of water quality standards resulting from the discharge of turbid water from the site.  District Ex. 40.  Representatives from the NYSDEC visited the construction site and noted a number of deficiencies with both E&S controls and stormwater management, resulting in violations of the New York State Environmental Conservation Law.  District Ex. 41.  The NYSDEC once again inspected the construction site on November 25, 2002, once again finding deficiencies in the E&S controls and stormwater management, constituting violations of the New York State Environmental Conservation Law.  District Ex. 43.

The District and Hillier dispute whether the deficiencies in the E&S controls resulted

6

from defects in the original design or from Leeward's failure to properly implement the design.
See District's 56.1 ¶¶ 159-164, 186, 195; Hillier's 56.1 Counter-statement ¶¶ 159-161, 186, 195.
Ultimately the problems with stormwater management and E&S controls were addressed through
change orders, resulting in an additional cost to the District of at least $188,056.00.  District Ex.
29 (Change Order 1-013); District's 56.1 ¶¶ 205-06.  The need to redesign the stormwater
management plan affected Leeward's ability to achieve substantial completion of its site work by
October, 2003.  District Ex. 30 at 298-99.

In a letter dated September 17, 2004, the District terminated Leeward for convenience as
permitted by their contract.  See Hillier Exs. 29, 56 (Pursuant to paragraph 14.4.1 of the contract,
"[t]he Owner may, at any time, terminate the Contract in whole or in part for the Owner's
convenience and without cause. . . .").  Leeward commenced its action against the District on
September 30, 2005.  Docket # 1.

## DISCUSSION

### I.   Standard for Summary Judgment

Under Rule 56, summary judgment should be "rendered if the pleadings, the discovery
and disclosure materials on file, and any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 320-23 (1986).

> Upon any motion for summary judgment pursuant to Rule 56 of the
> Federal Rules of Civil Procedure, there shall be annexed to the notice of
> motion a separate, short and concise statement, in numbered paragraphs,
> of the material facts as to which the moving party contends there is no
> genuine issue to be tried.  Failure to submit such a statement may
> constitute grounds for denial of the motion.

Local Civ. R. 56.1(a).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A trial judge may, therefore, grant summary judgment only if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law.  See Anderson, 477 U.S. at 250.  The inquiry performed is the threshold inquiry of determining whether there are any genuine factual issues that properly can be resolved only by a finder of fact.  Id.

Where a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56.  Under Local Rule 56.1(b), the papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short, and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.  Local Civ. R. 56.1(b).  Summary judgment may be granted only "[i]f after discovery, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.' "  Berger v. United States, 87 F.3d 60, 65 (2d Cir. 1996) (quoting Celotex, 477 U.S. at 323) (alteration in original).  Indeed, if the party opposing summary judgment does not respond to the motion, "summary judgment should, if appropriate, be entered against the adverse party."  Fed. R. Civ. P. 56(e).  However, even where the nonmoving party fails to respond to a motion for summary judgment, the court

may not grant the motion without first examining the moving party's

>submission to determine if it has met its burden of demonstrating that no
>material issue of fact remains for trial.  If the evidence submitted in
>support of the summary judgment motion does not meet the movant's
>burden of production, then summary judgment must be denied *even if no
>opposing evidentiary matter is presented*.

D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) (quoting Vt. Teddy Bear Co. v.

1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)) (emphasis in original).

Moreover, a court should "constru[e] the evidence in the light most favorable to the

nonmoving party and draw[] all reasonable inferences in its favor."  Mount Vernon Fire Ins. Co.

v. Belize NY, Inc., 277 F.3d 232, 236 (2d Cir. 2002); Farias v. Instructional Sys., Inc., 259 F.3d

91, 97 (2d Cir. 2001); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764 (2d Cir. 1998); see

also Anderson, 477 U.S. at 261 n.2.  Thus, "[o]nly when no reasonable trier of fact could find in

favor of the nonmoving party should summary judgment be granted."  Cruden v. Bank of New

York, 957 F.2d 961, 975 (2d Cir. 1992) (quoting H.L. Hayden Co. v. Siemans Med. Sys. Inc.,

879 F.2d 1005, 1011 (2d Cir. 1989)).

## II.   The District's Motion for Summary Judgment

### A.   Delineation of Federally Regulated Wetlands

Both the District and Hillier move for summary judgment on the question of liability for

the failure to delineate federally-regulated wetlands in the site drawings.  The District claims that

Hillier is liable for the additional costs it incurred for wetlands mitigation as a result of Hillier's

failure to include the presence and location of wetlands in the site plans that were put out to bid.

For its part, Hillier claims that the District is not entitled to damages since it knew that the

wetlands were not included in the site plans before it decided to award the contract to Leeward.

Insofar as the District sues Hillier for both breach of contract and architectural malpractice, the

issue is whether Hillier "failed to use due care in the performance of its contract obligations," or whether its "performance fell short of the applicable professional standards."  Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C., 91 N.Y.2d 256, 261 (N.Y. 1998) (citation omitted).[5]  While both parties claim that this issue can be resolved as a matter of law, it is apparent from their dueling citations to the record, that issues of fact preclude such a resolution. Each side points a finger at the other for the failure to account for the wetlands in the site plans that were put out for bid.

The contract between the District and Hillier states,

> The Architect shall prepare for the Owner all relevant forms and/or documents required for the approval of governmental authorities having jurisdiction over the project, including but not limited to required State Education Department forms and documents and a draft environmental impact statement (DEIS), and the Architect shall assist the Owner in connection with the Owner's responsibility for filing such documents.

District Ex. 6 ¶ 2.4.5.  Hillier retained the firm of O'Brien & Gere to prepare the DEIS, which was issued in April, 2000.  District's 56.1 ¶¶ 105-06.  The DEIS noted that "based on the site investigation, it appears that areas of the northern part of parcel 1 and the southern part of parcel

---

[5]As for the standard of care to be employed by Hillier, its contract with the District states,

> The Architect's services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Work.  The Architect shall submit for the Owner's approval and the Construction Manager's information a schedule for the performance of the Architect's services which may be adjusted as the Project proceeds, and shall include allowances for periods of time required for the Owner's and the Construction Manager's review and for approval of submissions by authorities having jurisdiction over the Project.  Time limits established by this schedule approved by the Owner shall not, except for reasonable cause, be exceeded by the Architect or Owner.

District Ex. 6 ¶ 1.1.3.

10

3 may meet the criteria for federal wetlands but have yet to be delineated or mapped.  Potential

wetlands impacts will be evaluated and appropriate permits and approvals will be obtained as

required prior to finalization of design plans."  District Ex. 21 at 4, Section 2.5.  Hillier thus

knew of the potential for wetlands upon the issuance of the DEIS.  District Ex. 7 at 178.

Moreover, Hillier's project architect conceded that Hillier was responsible for dealing with the

issue of wetlands, see District Ex. 19 at 234 ("It was HET's responsibility to know the contents of

the O'Brien and Gere report and to interpret those contents in a way that if there was a potential

wetlands, we should have pursued that information and as a consultant team, yes."), that "HET

was required to identify the wetlands prior to finalizing the site drawings," District's 56.1 ¶ 110,

and that HET was responsible for determining whether federally-regulated wetlands existed on

the site before submitting drawings and specifications to the New York State Education

Department for approval.  Id. ¶ 119.  Nonetheless, there is nothing in the record to indicate that

any action was taken by Hillier with respect to the wetlands issue until 8 months after the

issuance of the DEIS, in December, 2000.  District's 56.1 ¶ 114 ("HET advised Hillier of the

potential for wetlands in December 2000.").

   Hillier states that it was suggested that the contract drawings that had been put out to bid

should be withdrawn and that a new set of drawings taking into account the wetlands delineation

should be submitted, but that the District decided to accept Leeward's bid and deal with the

wetlands issue through change orders.  Hillier's 56.1 Counter-statement ¶ 132.  Thus, Hillier

argues that the District made an "informed decision to award the contract to Leeward" and that it

"must be held accountable for its own actions."  Memorandum of Law in Opposition (Docket #

69) at 5.  Moreover, Hillier argues that it cannot be held liable for delays resulting from the

amount of time it took for the Army Corps of Engineers and the NYSDEC to issue their approvals of the District's wetlands mitigation plan. Id. at 4-5. In contrast, the District notes that its superintendent did not recall discussions regarding whether the bid process should continue prior to finalizing the wetlands delineation and that the District was not given full disclosure about the potential impact of the wetlands, but rather was told that the wetlands were not something to worry about. District's 56.1 ¶ 132; District's 56.1 Counter-statement (Docket # 78) ¶¶ 24-28; see Hillier Ex. 22 at 119-20 (site design change due to wetlands was not an issue). Yet, the District points out, Hillier admits that the wetlands created a significant change to the bid package in terms of money and delay. District's 56.1 ¶ 133.

Overall, while the delays that occurred in receiving approvals from the Army Corps of Engineers and the NYSDEC may have been beyond Hillier's control, there are still issues of fact regarding whether the initial delays that occurred following the issuance of the DEIS in seeking a delineation of the wetlands and pursuing the subsequent approvals from the Army Corps of Engineers and NYSDEC – thereby resulting in the omission of the wetlands from the site drawings put out to bid – stemmed either from Hillier's failure to use due care in the performance of its contract with the District[6] or from Hillier's failure to act in accordance with the professional standards applicable to architects. There is no evidence in the record presented on these motions

---

[6] To the extent that Hillier claims that the District has waived its breach of contract claim by accepting Leeward's bid while knowing that the bid package did not include wetlands in the site drawings, the question of waiver, i.e., whether the District knew of the asserted breach of contract by Hillier and whether it intended to give up its claim for that breach by accepting Leeward's bid, is also an issue of fact barring summary judgment. See Coastal Power Int'l, Ltd. v. Transcontinental Capital Corp., 10 F. Supp. 2d 345, 370 (S.D.N.Y. 1998) ("A waiver is the voluntary abandonment or relinquishment of a known right. It is essentially a matter of intent which must be proved.") (citations omitted), aff'd, 182 F.3d 163 (2d Cir. 1999).

that would permit the Court to make this determination as a matter of law.

Therefore, I conclude, and respectfully recommend that Your Honor should conclude, that both the District and Hillier should be denied summary judgment on this issue.

**B.      Stormwater Management and Erosion and Sediment Control Plans**

The District seeks summary judgment against Hillier for defects in the stormwater management and erosion and sediment ("E&S") control plans.  While the parties treat these defects as one, they present different issues and will be treated separately.

With respect to the stormwater management plans, there is no dispute concerning responsibility for defects in these plans.  Hillier concedes HET's failure to use the correct type of stormwater distribution curve – type II as opposed to type III – in its stormwater management design.  District's 56.1 ¶¶ 185, 187; Hillier's 56.1 Counter-statement ¶ 185.  Thus, to the extent that the District's claims against Hillier are based on defects in the design of the stormwater management plans, I conclude, and respectfully recommend that Your Honor should conclude, that the District's motion should be granted on the issue of liability.[7]  Nonetheless, because the District has not specified a particular amount of damages attributable to these defects, that issue will have to be addressed at trial.

With respect to the E&S control plans, however, issues of fact prevent the grant of summary judgment.  Both the District and Hillier make numerous conflicting citations to the

_____

[7]Neither party raises any other specific issues concerning the stormwater management plans themselves, and Hillier does not otherwise disclaim liability with respect to those plans. However, to the extent that defects in the stormwater management design exacerbated problems stemming from the E&S control plans, such problems are encompassed by the question of liability regarding the E&S control plans, which, as explained herein, presents issues of fact precluding summary judgment.

record, which need not be recounted at length here.  Compare Memorandum of Law in Support

(Docket # 59) at 34-42 with Memorandum of Law in Opposition at 6-10.  In sum, the District

claims that Hillier was responsible for defects in the E&S control plans, while Hillier claims that

Leeward was responsible for the E&S control problems on the site due to its failure to implement

the E&S controls in accordance with the design documents.  While there is no dispute that the

high school site work had to be done in compliance with State Pollutant Discharge Elimination

System ("SPDES") General Permit No. GP-93-06, see District Ex. 31, the parties dispute whether

the design documents incorporated the requirements of that permit and whether they placed any

limitation on the number of acres at the site that could be cleared at any one time.  See, e.g.,

District's 56.1 ¶¶ 159-61, 164; Hillier's 56.1 Counter-statement ¶¶ 159-61; District Ex. 45 at

HGA 005911; Hillier Ex. 37 at 65.  Given the conflicting evidence, I conclude, and respectfully

recommend that Your Honor should conclude, that the District should be denied summary

judgment insofar as its claims are based on defects in the E&S control plans.

　　　In addition to the District's claim that Hillier provided defective stormwater management

and E&S control plans, the District also claims that Hillier is liable for breach of its contractual

duties to inspect Leeward's implementation of the E&S control plans.[8]  Under the parties'

contract, "The Architect shall visit the site at intervals appropriate to the stage of construction or

as otherwise agreed by the Owner and Architect in writing to become generally familiar with the

progress and quality of the Work completed and to determine in general if the Work is being

---

[8]This assertion does not appear to encompass inspection of Leeward's implementation of
the stormwater management plans.  In any event, whether Hillier is liable on this alternate ground
is irrelevant since, as explained above, Hillier is liable for its defective design of the stormwater
management plans.

14

performed in a manner indicating that the Work when completed will be in accordance with the Contract Documents."  District Ex. 6 ¶ 2.6.5.  The contract further states, "The Architect's certification for payment shall constitute a representation to the Owner, based on the Architect's observations at the site as provided in Subparagraph 2.6.5, on the recommendations of the Construction Manager and on the data comprising the Contractors' Applications for Payment, that, to the best of the Architect's knowledge, information and belief, the Work has progressed to the point indicated and the quality of the Work is in accordance with the Contract Documents." Id. ¶ 2.6.9.1.  "The Architect shall have authority, after notification to the Construction Manager, to reject Work which does not conform to the Contract Documents. . . . "  Id. ¶ 2.6.10.

"Generally, a person who contracts with an architect and who alleges that the architect has breached the obligation to properly design and supervise the construction, may sue for breach of contract and negligence."  Diocese of Rochester, New York v. R-Monde Contractors, Inc., 562 N.Y.S.2d 593, 596 (N.Y. Sup. 1989) (citation omitted), aff'd, 166 A.D.2d 891 (4th Dep't 1990). Hillier claims that under its contract with the District, it did not have a duty to inspect the contractors' work.  However, while Hillier "was not obliged to supervise the construction work or to make exhaustive or continuous on-site inspections, it was, nevertheless, required to visit the site periodically in order to be familiar with the progress and quality of the work, to determine generally if the work was proceeding in accordance with the contract documents, to keep [the District] informed about the progress and quality of the work, and to guard [the District] against defects in the work.  [Hillier's] obligation to issue certificates of payment required [Hillier] to be familiar with both the quantity and quality of the work done."  Id.

Moreover, while the parties' contract contains an exculpatory provision, excusing Hillier

15

from responsibility "for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection" with the construction project, "since these are the Contractors' responsibility under the Contracts for Construction," District Ex. 6 ¶ 2.6.6, such language "does not immunize [Hillier] from liability flowing from a breach of its [own] duties to [the District]." Diocese of Rochester, 562 N.Y.S.2d at 596. In support of its motion, however, the District provides no evidence regarding whether or not Hillier made visits to the site to view Leeward's work or to insure that Leeward's work was not defective prior to issuing any Certificate for Payment for that work. Rather, the evidence presented focuses solely on the issue of Hillier's liability for defects in the design of the E&S control plans. Therefore, I conclude, and respectfully recommend that Your Honor should conclude, that the District is not entitled to summary judgment against Hillier for defects in the E&S control plans on this alternate ground.

### C.   Additional Fee for High School Redesign

The District claims that it is entitled to summary judgment on Hillier's counterclaims for additional fees to the extent that they seek to recover $300,000 for the redesign of the high school and value engineering which occurred after the bid bust.[9]  Following the bid bust, on November 2, 2001, Hillier submitted to the District an "Amendment to the Professional Services Agreement" which it stated was in accordance with Paragraph 3.3.1.2[10] of the parties' contract. See District Ex. 17. The proposed Amendment was for redesign of the building, revisions to

---

[9]The counterclaims seek $511,452.27 total. See Docket # 25.

[10]Paragraph 3.3.1.2 includes as Contingent Additional Services "[m]aking revisions in Drawings, Specifications, or other documents when such revisions are . . . requested by the Owner because the Construction Manager's estimate of Construction Cost exceeds the Owner's budget, except where such excess is due to changes initiated by the Architect in scope, capacities of basic systems, or the kinds and quality of materials, finishes or equipment."

16

construction drawings and specifications, and rebidding of the project, and Hillier sought an additional $300,000 in compensation.  Id.  While Hillier sought written authorization for this additional work, the District never signed the proposed Amendment.  Nonetheless, Hillier proceeded with the work.

According to the contract between Hillier and the District, "[i]f services described under Contingent Additional Services in Paragraph 3.3 are required due to circumstances beyond the Architect's control, the Architect shall notify the Owner prior to commencing such services.  If the Owner deems that such services described under Paragraph 3.3 are not required, the Owner shall give prompt written notice to the Architect.  If the Owner indicates in writing that all or part of such Contingent Additional Services are not required, the Architect shall have no obligation to provide those services."  District Ex. 6 ¶ 3.1.1.  Hillier argues that in accordance with Paragraph 3.1.1, because this additional work, which it calls Contingent Additional Services, was required due to circumstances beyond Hillier's control, it notified the District prior to performing these services.  Hillier claims that by failing to give prompt written notice to Hillier that such services were not required, the District acknowledged that these additional services were required, and thus, the District must pay for them.

In response, the District argues that the redesign did not constitute Contingent Additional Services under the parties' contract.[11]  Moreover, the District claims that the need to perform such additional services was not due to circumstances beyond Hillier's control and therefore,

---

[11]Indeed, Hillier's assertion that the additional work constituted Contingent Additional Services for which it did not need written authorization from the District does not square with the fact that its notice to the District was in the form of a proposed Amendment to their contract, submitted presumably in accordance with Paragraph 9.6 thereof which states, "This Agreement may be amended only by written instrument signed by both Owner and Architect."

Paragraph 3.1.1 is inapplicable.  Rather, the District contends that in accordance with Paragraph 5.2.3 of the parties' contract, Hillier was required to perform the additional work at no cost to the District.  <u>See</u> District Ex. 6 ¶ 5.2.3 ("In the event that the Construction Manager's estimate or the lowest bona fide bid or negotiated proposal received by the Owner exceeds the Owner's budget for reasons other than those described in Paragraph 3.3 [Contingent Additional Services], the modification of Contract Documents shall be the limit of the Architect's responsibility.  The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not the Construction Phase is commenced.").

From the record presented, there are issues of fact regarding both the reasons, and the party or parties responsible, for the bid bust.  For example, the District cites testimony to the effect that Hillier issued roughly 155 drawings by addendum during the bid period and that the number of addenda and design changes during the bid process indicated that the "project was still being designed while it was out on the street."  District's 56.1 ¶¶ 73, 75.  While Hillier claims that these statements are based on the speculation and opinion of a witness employed by Turner, Hillier's 56.1 Counter-statement ¶¶ 73, 75, Hillier does not present evidence to refute the assertion that additional drawings and design changes were, in fact, being made during the bid process.  Therefore, it cannot be determined as a matter of law that the redesign work constitutes Contingent Additional Services under Paragraph 3.3.1.2 of the contract, which excludes revisions where the estimate of costs exceeds the budget "due to changes initiated by the Architect in scope, capacities of basic systems, or the kinds and quality of materials, finishes or equipment."  Moreover, to the extent that the redesign work does not qualify as Contingent Additional Services, Hillier provides no evidence or argument to support a finding that the parties agreed to

18

an oral modification of their contract that would allow for recovery of the $300,000 fee.  See

John St. Leasehold LLC v. F.D.I.C., 196 F.3d 379, 382 (2d Cir. 1999) ("New York law . . . does

not permit oral modification when the original written agreement provides that modifications

must be in writing and signed.  However, even where it is provided that modifications must be in

writing and signed, New York will enforce oral modifications in two circumstances – where

there has been (1) partial performance or (2) reliance – but only where the subsequent

performance or reliance is unequivocally referable to the modification.") (internal quotation

marks and citations omitted).

 Accordingly, I conclude, and respectfully recommend that Your Honor should conclude,

that neither party is entitled to summary judgment with respect to Hillier's counterclaims for the

fee for the redesign of the high school.

## III. Hillier's Motion for Summary Judgment

### A. Failure to Mitigate Damages

 Hillier contends that any recovery by the District on its claims should be reduced due to

the District's failure to mitigate its damages.  "New York's courts adhere to the universally

accepted principle that a harmed plaintiff must mitigate damages."  Aristocrat Leisure Ltd. v.

Deutsche Bank Trust Co. Americas, 618 F. Supp. 2d 280, 306 (S.D.N.Y. 2009) (internal

quotation marks and citations omitted).  "It is the breaching party's burden to prove that a

plaintiff could have lessened its damages.  More specifically, the breaching party must show that

the plaintiff *unreasonably* failed to minimize damages.  However, if the course of action chosen

by the plaintiff was reasonable, the plaintiff can recover despite the existence of another

reasonable course of action that would have avoided further damage."  Id. (internal quotation

marks and citations omitted) (emphasis in original); see also Coastal Power Int'l, 10 F. Supp. 2d

at 370 ("[T]he defense of failure to mitigate requires the defendant to establish not only that the

plaintiff unreasonably failed to mitigate, but that reasonable efforts would have reduced the

damages.") (footnote omitted).  "[T]he issue of mitigation of damages is generally a jury

question."  Wiechelt v. United Parcel Serv., Inc., No. 03-CV-345A, 2007 WL 2815755, at *3

(W.D.N.Y. Sept. 24, 2007) (citing Fisher v. First Stamford Bank & Trust Co., 751 F.2d 519, 524

(2d Cir. 1984)).

Based on the record presented, it cannot be determined as a matter of law that the

District's course of action was unreasonable under the circumstances.  While Hillier claims that

Leeward was willing to complete the base contract site work for $506,382 and the additional site

work for $660,000, an amount $1,734,189 less than that claimed by the District as damages, see

Hillier's Reply Memorandum of Law (Docket # 83) at 5, there is evidence in the record that not

all of the work that needed to be completed was included in that $506,382 amount.  See, e.g.,

Hillier Ex. 28 at 554-55 (repair of mitigated wetlands not included), 561 (cost of completing and

reseeding practice field not included), 575-76 (cost to finish grade and reseed all areas not

included).  Hillier's assertion that the District could have paid less to Leeward does not establish

as a matter of law that the District acted unreasonably in choosing not to have Leeward complete

the site work.  Indeed, there is no evidence in the record that the District had sufficient funds to

pay Leeward even these lower amounts, which totaled $1,166,832, for completion of both the

base contract site work and the additional site work.  See Hillier Ex. 16, Tab 5 (District had

$957,287 remaining in the project budget); District Ex. D[12] at 88 (as of June, 2004, District made

_____

[12]The District's Exhibits in opposition to Hillier's motion are Docket # 76.

payments exceeding the referendum amount by $741,000); District Ex. E (as of June 30, 2008, District's outstanding encumbrance for site work was $831,688.14).  Simply put, questions of fact exist with respect to the mitigation of damages, and I conclude, and respectfully recommend that Your Honor should conclude, that Hillier's motion for summary judgment on this issue should be denied.

### B.     Costs to Repair or Replace and Costs of Change Orders

The appropriate measure of damages on a claim for defective design "is the cost to repair the defects or, if the defects are not remediable, the difference in value between a properly constructed structure and that which was in fact built.  This rule is merely a recognition of the precept that damages are intended to place the injured party in the same position as if there had been no breach." Brushton-Moira, 91 N.Y.2d at 262 (citations omitted).  In the Third-Party Complaint, the District seeks monetary damages from Hillier for the "additional costs to repair, replace and correct the defective work, and defend claims from others due to delays in the Project and defects in the design and implementation of said design."  Third-Party Complaint ¶¶ 24, 31. Hillier argues in its motion papers that the District should be limited to recovering only the costs to complete the high school project and that it should be barred from recovering the costs of change orders resulting from design errors or omissions.

According to the District, in order to be placed in the position it would have been in had Hillier performed its contract, the District "should get its cost to complete, including costs to repair defective items and items never completed by Leeward, as well as all other cost overruns caused directly by Hillier's acts and omissions."  Memorandum of Law in Opposition (Docket # 80) at 8.  The District claims that recovery of these amounts would not be "double-dipping," as

21

argued by Hillier, since its costs to complete would be reduced by the outstanding balance on its contract with Leeward.  Id.; see, e.g., Caggianelli v. Sontheimer, 46 A.D.3d 1206, 1207 (3d Dep't 2007) ("It is well settled that, in a case of defective construction, the appropriate measure of damages is the [reasonable market] cost to repair the defects if the defects are reparable, less any amount still due under the contract.") (internal quotation marks and citations omitted).  In its motion papers, Hillier has not made clear whether the amounts set forth in the District's expert report as costs to complete overlap to any degree with the costs to correct design errors and omissions.  See Hillier Ex. 16 at 21.  If not, then the Court is not convinced that recovery of these damages is a "double-dip" as opposed to a means of placing the District in as good a position as it would have been in had Hillier performed its contract.

It appears from the parties' papers that they are fundamentally in agreement with regard to the legal rules governing the District's recovery of damages on its claims against Hillier.  Hillier takes issue with the calculation of damages put forward by the District's expert, but such argument relates to the evidence that would be presented in support of the District's damages claims, rather than the legal rule that governs what damages are recoverable.  Hillier is free to challenge the methodology employed by the District's expert in his calculation of damages at trial.  Therefore, I conclude, and respectfully recommend that Your Honor should conclude, that Hillier's motion to preclude the District from recovering its costs to complete and its costs of change orders should be denied.

**C.      Derivative Claim Based on Liquidating Agreement**

Hillier claims that it is entitled to summary judgment on the District's derivative claim to the extent that it is based on the existence of a liquidating agreement between the District and Leeward.  However, by its terms, the District's so-called "Derivative Claim" is simply a claim for indemnification.  See Third-Party Complaint ¶ 18 ("Because Leeward's allegations against the School District involve the scope of work for which Hillier and Turner were hired, if Leeward recovers against the School District, then it is necessarily because of the collective and/or individual acts or omissions of Hillier and/or Turner, in whole or in part.").  There was no liquidating agreement in place between the District and Leeward prior to the institution of the third-party action, and the District has not sought to amend its Third-Party Complaint in light of its settlement agreement with Leeward to assert a pass-through claim on Leeward's behalf.

The settlement agreement does not, in any event, constitute a liquidating agreement. Liquidating agreements consist of three elements: "(1) the imposition of liability upon the [intermediary] for a [damaged party's] increased costs, thereby providing the [intermediate party] with a basis for legal action against the [responsible party], (2) a liquidation of liability in the amount of the [intermediary's] recovery against the [responsible party], and (3) a provision for the pass-through of that recovery to the [damaged party] . . ."  Menorah Home & Hosp. for the Aged & Infirm v. Fireman's Fund Ins. Co., No. 04-CV-3172, 2007 WL 1109079, at *2-*3 (E.D.N.Y. Apr. 13, 2007) (quoting N. Moore St. Developers v. Meltzer/Mandl Architects, P.C., 799 N.Y.S.2d 485, 489 (1st Dep't 2005)).  While the District's settlement agreement with Leeward includes an agreement by the District to fund part of the settlement with some of the monies it might recover on its third-party claims against Hillier and Turner, the District did not

acknowledge its liability to Leeward on any claim that Leeward might have based on Hillier's conduct.  See District Ex. N ¶ 3 ("This Settlement Agreement shall in no event be construed as or be deemed to be evidence of an admission or a concession on the part of Sullivan West of any claim or any fault or liability or damages whatsoever.  Sullivan West denies any and all wrongdoing of any kind whatsoever in connection with the Lawsuit and does not concede any infirmity in the defenses which it has asserted or intends to assert.  The Parties have reached the agreement reflected herein in order to avoid further expense, inconvenience and delay, and to dispose of expensive, burdensome and protracted litigation."); see also Mars Assocs., Inc. v. New York City Educ. Constr. Fund, 126 A.D.2d 178, 192 (1st Dep't) ("[O]ur examination of the record indicates that Mars has never admitted its liability to subcontractors Smith and S&M in Mars' liquidation agreements with them, which agreements provide that these two subcontractors agree to accept in satisfaction of their claims against Mars, whatever sum, if any, Mars is able to recover from the Fund. . . . Since Mars did not admit its liability to subcontractors Smith and S&M . . . the principle expressed in the cases of Ardsley Constr. Co. v. Port of N.Y. Auth. (supra) and Lambert Houses Redevelopment Co. v. HRH Equity Corp. (supra) is inapplicable here."), appeal dismissed, 70 N.Y.2d 747 (N.Y. 1987).  Moreover, contrary to the cases cited by the District, the settlement agreement in this case lacks the kind of "conditional release" that has allowed for the assertion of a pass-through claim.  See id. ¶ 4 ("Leeward for itself, all of its current or former partners, shareholders, directors, parents, subsidiaries, affiliates, representatives, officers, employees, and agents, hereby releases and forever discharges Sullivan West, its agents, servants, officers, directors, trustees, employees, shareholders, attorneys, successors and assigns, affiliates, subsidiaries and parent companies, none of whom admit any

24

liability but all expressly deny liability, from any and all claims, demands, damages, actions, causes of action or suits of any kind or nature, known or unknown, existing as of the effective date of the Settlement Agreement, which have been alleged or asserted in the Lawsuit or which could have been asserted in the Lawsuit, and which arise out of, or relate to the acts, failure to act, omissions, misrepresentations, facts, events, transactions, occurrences or other matters alleged in the Complaint."); see also, e.g., Cable Belt Conveyors, Inc. v. Alumina Partners of Jamaica, 717 F. Supp. 1021, 1024-27 (S.D.N.Y. 1989) (discussing cases in which "conditional releases" were granted, allowing for the assertion of pass-through claims); Lambert Houses Redev. Co. v. HRH Equity Corp., 117 A.D.2d 227, 231 (1st Dep't 1986) ("[A] release would be completely inconsistent with the aim and purpose of a liquidating agreement, which is not to release liability but rather to liquidate liability in whatever amounts can be recovered against the other parties.  A release of the general contractor HRH would prevent the continued assertion of such claims between plaintiff Lambert and the subcontractors.").

Consequently, to the extent that the District's derivative claim was intended to be a pass-through claim against Hillier, I conclude, and respectfully recommend that Your Honor should conclude, that such claim should be dismissed.[13]

_____

[13]The District argues that "[e]ven if the liquidating agreement suffered from a lack of formality, Hillier's argument still fails because the District and Leeward could simply void the settlement agreement and reform the agreement."  See Memorandum of Law in Opposition at 19.  However, there is no evidence in the record from which the Court can determine Leeward's intent in entering into the settlement agreement.  See MFS/Sun Life Trust v. Van Dusen Airport, 910 F. Supp. 913, 932 (S.D.N.Y. 1995) ("The interpretation of a settlement agreement, as with any contract, turns on the intent of the parties.") (citations omitted).  Thus, the Court cannot determine whether the Agreement is voidable as based on mutual mistake.

D.      **Common Law Indemnification**

"The principle of common law, or implied indemnification, permits one who has been

compelled to pay for the wrong of another to recover from the wrongdoer the damages it paid to

the injured party."  Tiffany at Westbury Condo. v. Marelli Dev. Corp., 40 A.D.3d 1073, 1077 (2d

Dep't 2007) (internal quotation marks and citations omitted).  To recover on a claim for

indemnification, the plaintiff "must have delegated exclusive responsibility for the duties giving

rise to the loss to the party from whom indemnification is sought, and must not have committed

actual wrongdoing itself."  Id. (internal quotation marks and citation omitted).

Leeward's Complaint alleges as follows:

> [The District] materially and substantially breached the Contract, by *inter alia*,
> delaying, obstructing and interfering with Leeward's work under the Contract,
> including:
> a.  failing to survey the Project property to ascertain the presence of wetlands;
> b.  failing to obtain the necessary permits for the destruction and mitigation of
> wetlands on the Project;
> c.  failing to provide adequate erosion and sedimentation designs for the Project;
> and
> d.  failing to provide adequate storm water designs for the Project.

Complaint ¶ 11.[14]  Because Hillier and the District dispute who was responsible for the damages

incurred by Leeward resulting from the failure to deal properly with the wetlands and E&S and

stormwater design issues, the Court finds that there are triable issues of fact precluding a grant of

summary judgment to Hillier on this claim.

---

[14]Contrary to Hillier's reading, see Hillier's Memorandum of Law in Support (Docket #
65) at 20-21; Reply Memorandum of Law at 19-20, Leeward's claim is not based on the narrow
premise that the District simply failed to inform Leeward of the existence of wetlands on the
property prior to awarding it the site work contract.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that Your Honor should grant in part and deny in part both the District's motion (Docket # 58) and Hillier's motion (Docket # 50) as set forth herein.

## NOTICE

Pursuant to 28 U.S.C. §636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) working days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation.  Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Cathy Seibel at the United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel and should not be made to the undersigned.

Dated: March 10, 2010
      White Plains, New York

Respectfully submitted,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

27

A copy of the foregoing Report and Recommendation has been sent to the following:

The Honorable Cathy Seibel, U.S.D.J.